## RISSIEUW v. UNITED STATES.

### No. 10430.

Circuit Court of Appeals, Eighth Circuit.

April 6, 1936.

Gale B. Wyman, of Deadwood, S. D., for appellant.

George Philip, U. S. Atty., of Sioux Falls, S. D. (Frank Wickhem, Asst. U. S. Atty., of Sioux Falls, S. D., and John T. Heffron, Asst. U. S. Atty., of Deadwood, S. D., on the brief), for the United States.

Before STONE, VAN VALKENBURGH, and FARIS, Circuit Judges.

FARIS, Circuit Judge.

Appellant, with five others, was jointly indicted for a conspiracy to violate section 549, title 18, U.S.C. (18 U.S.C.A. § 549). Prior to the trial, three of the defendants pleaded guilty. Pending the joint trial of the remaining three, one of them was dismissed hence by the district attorney, and on the trial another was ac-

quitted. Appellant was convicted and sentenced to prison for two years. From this conviction and sentence he took this appeal in due form.

The overt acts pleaded and proved, as the statute invoked fairly forecasts, occurred on the Rosebud Indian Reservation in Todd county, S. D. Three of the overt acts set out in the indictment and relied on consisted of consummated thefts of horses on and from premises severally located in the reservation.

The only contention involved on this appeal is that the trial court erred in not directing the jury to acquit appellant, for that the evidence adduced by the government was not sufficient to prove his guilt of the charge of conspiracy. Appellant's counsel candidly and tersely expresses this, his sole contention, thus: "The only question to be considered on this appeal, is the sufficiency of the evidence to sustain the judgment and verdict herein."

This alleged error renders necessary a brief statement of the evidence relied on by the government to show appellant's involvement in the conspiracy charged. The facts that the horses were stolen as charged, that two lots of them, called "bunches" in the record, were delivered to appellant, and that he gave to the actual thief a Nash car in payment for them, is not denied by anybody in this record. Appellant himself testified as to the latter two facts, and did not deny the former.

It may be conceded that there is no direct proof as to a conspiracy of appellant with Abraham Kills In Sight to steal the horses of John Good Elk, alias Pacer, and scarcely is there aliunde any proof of such a conspiracy. But Abraham pleaded guilty, and, since he is not appealing, the fact is not here and now important. The statute is clear that only a single overt act, done subsequent to the formation of the conspiracy by any party thereto, is required. So we need not inquire in the light of the record and of the contention urged whether there was proof of a conspiracy between appellant and Abraham, or whether, if there was, the conspiracy between him and appellant was at all connected with the conspiracy among appellant, Noah Little, and other parties named in the indictment. For no such point was raised below, and none such is now urged.

The actual thieves, Noah Little, Paul Eagle Deer, and Abraham Kills In Sight (three of those indicted jointly with appellant, who pleaded guilty and testified for the government), testified categorically on the trial to the act of stealing three bunches of horses. It does not however, appear from the record that the horses which Abraham Kills In Sight stole, or helped to steal, were the horses stolen from Elmer Cast or Joseph Beads, who, as the indictment charges, were two of the victims of the larcenies; nor is it legally important for the reasons already set out. Noah Little testified that he stole the horses of Cast and Beads and that Paul Eagle Deer was with him and helped him in the taking and driving of the horses and in the delivery of the bunch of Cast's horses to appellant. This testimony is fully corroborated by the testimony of Paul Eagle Deer. But the point we assume on which appellant bottoms his contention of a lack of evidence is that prior to these larcenies no conspiracy to commit them, or have them committed, is shown as against appellant. On this contention we are clearly of the opinion that the record discloses that counsel is in error. Let us look to the record.

Noah Little, who actually stole the horses of Cast and Beads, testified thus: "I am pretty sure it was in the month of November, in the afternoon, about the middle of the month. Abe told me they were out to Beads trying to buy horses. Jake was there when Abe told me that, they was out to Joe Beads' trying to buy horses and Beads would not sell their horses. He wanted Cast's horses and the Beads' horses. He told me if I would deliver them horses he was going to give me that Nash car. Jake said that, and Abe was right there. I told him I would do what I can, but I didn't do anything for quite a while, until I met Jake at Lake View, which is southeast of St. Francis about sixteen miles. This was about the latter part of November, I met him there alone. He asked me when I was going to bring down Beads' and Cast's horses. I told him I don't know."

Paul Eagle Deer, who assisted Noah Little in the theft of the Cast horses and in rounding up the Beads horses, testified that, after he and Noah Little delivered the Cast horses to appellant at the premises of the latter, he heard a conversation between Little and appellant. Apposite to the contention of appellant now under discussion, this witness said: "The

Cast horses were south of my place. We picked them up and drove them away, three head, a sorrel mare, sorrel colt, and a two year old blue stud, and took them to Lake View. I went with him clear to Lake View, to Jake Rissieuw's. We got to Lake View and saw Jake Rissieuw at his place. That was about 10:00 or 11:00 o'clock at night. Jake told us to run the horses in the corral there, and he kind of looked them over. Then Jake and Noah went in the house and after while Noah came out and called me inside, so I went inside. Just the three of us were there, Jake, Noah and I. I asked Jake for money. He said, I ain't got any money right now, I only got $2.00, so he let me have it. After we were getting ready to come out, Jake told Noah Little to bring them Beads' horses. Noah said, when do you want them horses, and Jake said, tomorrow night would be better, because I got a truck ready to load them up. Noah said, it is all right if I can, I will bring them over tomorrow night."

In addition to the above-quoted excerpts from the testimony of these two Indian accomplices, the record shows numerous corroborating facts and incidents. The wife of Beads, to whom one bunch of the stolen horses belonged, testified that in October or November, 1934, and prior to the theft of the horses in January 1935, appellant and his brother came to the Beads' premises and tried to buy Beads' horses, which were afterwards stolen by Little and traded with the horses of Elmer Cast to appellant for the Nash automobile. Appellant admitted that he was at the premises of Beads about the time testified to by Mrs. Beads and Noah Little. But he said on the witness stand that he had gone there to buy wood and not to buy horses. In a voluntary statement made by him before the trial, he had, in fair effect, denied he had been there. True, his statement was that he had never been at Beads' to buy horses; but he did not then explain, as he did on the trial, that, while he had been there, it was for the purpose of buying wood. So his denial was an obvious evasion, in the nature of a negative pregnant.

But in the face of all this his learned counsel contends that the evidence of the existence of a conspiracy was wholly circumstantial, and that, pursuant to well-settled fundamental rules and principles governing such evidence, the circumstances shown were wholly insufficient to make out any evidence of guilt. It seems plain that not only were circumstances not at all relied on to eke out guilt, but that no such reliance was necessary in the case. The triers of fact were merely called on to construe the language used by appellant to the actual thief, in the light of subsequent events. Appellant, according to the evidence, said to his coconspirator, Noah Little, on one occasion prior to the theft, that he (appellant) had tried to buy, but had been unable to buy, the horses of Beads, but that Beads would not sell them, and that he also wanted Cast's horses; that, if Little would "deliver" these horses to him, appellant would give him a Nash car, which prior to that Little had tried to buy from appellant, but had been unable to buy, obviously for lack of the wherewith. According to Paul Eagle Deer, who related another conversation between Noah Little and appellant, the word used by appellant was "bring." He told Little "to bring them Beads' horses; * * * tomorrow night would be better, because I got a truck ready to load them up." So it is clear that, when the jury determined what appellant meant by the use of the words "deliver" and "bring," no occasion arose to resort to circumstantial evidence. Hardly would it be expected that even among light-fingered gentry of the breed in hand so crass and brutal a word as "steal" would be used when euphemistic words such as "bring" and "deliver" were so numerously at hand as suggestive synonyms to express the intention held in mind. In fact, the jurors were relieved of the labor of interpretation by the words of the appellant himself. For in the first conversation with Noah Little he told him, if he (Little) got caught delivering the horses, Little should take the responsibility. After the horses were delivered, appellant told Little, if he were caught, he (appellant) would take the responsibility.

True it is that in the very nature of the crime of conspiracy proof thereof is ordinarily and of necessity to be deduced from the acts of the parties, and need not be, and rarely is, shown by explicit verbal or written agreements. Shook v. United States (C.C.A.) 10 F.(2d) 151; Murry v. United States (C.C.A.) 282 F. 617; Hilt v. United States (C.C.A.) 12 F.(2d) 504; Pearlman v. United States

(C.C.A.) 20 F.(2d) 113; Babb v. United States (C.C.A.) 27 F.(2d) 80; Stack v. United States (C.C.A.) 27 F.(2d) 16; Goode v. United States (C.C.A.) 58 F.(2d) 105; Feigenbutz v. United States (C.C.A.) 65 F.(2d) 122.

A written agreement embodying a conspiracy to commit an offense against the United States would of course be void and unenforceable, so why take the trouble to make it? It is not to be expected that conspirators would publish the fact of a felonious agreement from the housetops, or "cry it aloud in the street." But there is neither a statute nor any rule of law which forbids proof of a conspiracy by explicit or implicit verbal means, as here occurred. The language here employed may well be said to have been explicit. For, as already forecast, it was not necessary here to rely on circumstantial evidence for proof of the existence of a conspiracy; this was shown by the direct evidence of the two Indian witnesses who actually committed the overt acts. The only faint function of such circumstances as were proved was to cast light on the meaning of the words used by appellant to the witness Little, if any light was necessary to a jury made up of persons who were presumably intelligent.

We are convinced that the record quite conclusively shows the guilt of the appellant, and was wholly sufficient in that behalf. Since the contention of insufficiency is the sole error complained of, the case should be affirmed, and so we order.